## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

Anthony Carey, #152763                              *

          Plaintiff,                              *

Vs.                                                 *       **2:07-CV-1106-MHT**

Alabama pardon & Paroles et. al.,                   *

          Defendants.                              *

## OBJECTION TO MAGISTRATES
## RECOMMENDATION

COMES NOW Anthony Carey (hereinafter "CAREY") and moves this Court to accept and *Grant* relief as judicial comity necessitates herein, as follows:

First and foremost it must be respectfully pointed out that Carey had not **named** as Defendants: "the *Alabama Board of Pardon & Paroles*" ("the Board") but merely listed said title inclusive to "et. al." as such on the cover page of his §1983 civil complaint, as a mere formality.

This Court well knows better than Carey, that claims as to whom actually violated certain specific violations, as herein, are prima facially listed on page 2 of said §1983 complaint form, under Section III, entitled "Name and Address of individual(s) you allege violated your Constitutional Rights," **Id.**    Clearly Carey's Document #1 predicates sufficient proof that Carey was suing certain –specific named defendants, not the departmental agency itself, as in artfully pleaded –factually speaking now objected too.

Carey requests from the District Judge that said civil complaint be reviewed under the doctrine of *Haines v. Kerner,* 404 U.S. 519, 30 L.Ed.2d 652, 92 S.Ct. 594 (1972)(concerning general rules pro se pleadings . . .), simply because Carey merely labeled the cover sheet with the agency, primarily responsible for the violation, did not mean a suit was against the agency -the

facts mentioned on page 3 (Doc#1) listing three (3) unique and separate succinct claims factual enough to specifically name each of the individual named defendants, albeit collectively, separately allow Defendants to plead an affirmative defense, if ones warranted, at this early stage.

In the landmark decision *Ex parte Young*, 209 U.S. 123, 52 L. Ed. 714, 28 S. Ct. 441 (1908), the Supreme Court recognized an exception to the general rule that a state official, acting in his official capacity, is immune from suit. The *Young* court held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law by a state official. *Id.* at 155-56, 159. In *Eldeman v. Jordan*, the Supreme Court interpreted *Young* expansively, holding that a federal court may impose an injunction that governs the official's future conduct but not one that awards retroactive monetary relief. 415 U.S. 651, 664-66, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974).

Simply put, Magistrate Moorer misconstrued Carey's complaint, inapposite to pro se pleadings under *Haines v. Kerner*, progeny.          The Eleventh Amendment does not bar claims for equitable relief against the individual Defendants in their official capacities, as long as those claims are only for prospective injunctive relief. *Ex Parte Young*, supra.     *Young* and its progeny provide for prospective injunctive relief for an ongoing violation of federal law, and Carey requested for "*prospective declaratory and injunctive relief*," against further, future discriminatory actions. Therefore, the Eleventh Amendment as to the individual Defendants does not bar these claims in their official capacity, inapposite as was subjectively asserted by Magistrate Moorer at pp. 2 -3 under ¶ 1A,B @ Discussion.

Moreover, the Eleventh Amendment sovereign immunity does not apply to bar relief under 1983 when a state official is sued for prospective injunctive relief to "end a continuing violation of federal law," as was alleged, requested by Carey. *See Seminole Tribe of Florida*, 517 U.S. 44, 73,

116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996). Although "neither a State nor its official acting in their official capacities are 'persons' under 1983," *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989), a state official sued for prospective injunctive relief in his or her official capacity is a person under 1983, *see id.* at 71 n.10, as are state officials sued in their individual capacities. *See Hafer v. Melo*, 502 U.S. 21, 31, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991), thus Carey's named Defendants should be allowed to plead the defense, not the Court, as previously recommended by Magistrate T. Moorer, now under plenary review.

State officials acting in their individual capacities are not protected by the sovereign immunity conferred by the Eleventh Amendment. *See Harden v. Adams*, 760 F.2d 1158, 1164 (11th Cir. 1985). The Eleventh Amendment also does not bar claims (for monetary or injunctive relief) against the individual Defendants in their individual capacities. *See Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992). Thus Carey's specific named Defendants: "1) Bob Riley, 2) Troy King, 3) Miriam Shehane ("VOCAL") and all three (3) individual defendants 4) Sidney Williams, 5) Velinda Weatherly and 6) Robert Longshore as mentioned are not entitled to the "Eleventh Amendment" immunity, as erroneously mentioned by the magistrate at this inception, *see Adams*, supra.

"Because qualified immunity is a defense not only from liability, but also from suit, it is 'important for a court to ascertain the validity of a qualified immunity defense **when asserted by the named Defendants**" in the lawsuit.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998)). "The qualified immunity defense may be raised and addressed on a motion to dismiss, and will be granted if the complaint 'fails to allege the violation of a clearly established constitutional right.'" *Smith v. Siegelman*, 322 F.3d 1290, 1294 (11th Cir. 2003) (quoting *Chesser v. Sparks*, 248 F.3d

1117. 1121 (11th Cir. 2001)). Carey maintains that for the Defendants "to [have] received qualified immunity, those official's must first prove [they] were acting within the scope of discretionary authority when the allegedly wrongful acts occurred." *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir. 2002). "[A] government official [must] prove that he [or her] acted within his [or her] discretionary authority by showing [the] 'objective circumstances which would compel the conclusion that his [or her] actions were undertaken pursuant to the performance of his [or her] duties and within the scope of his authority.'" *Courson v. McMillian,* 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir. 1988)). At all times relevant to this issue, Carey asserts, maintains that said Defendants usurped their performance of duties and acted outside the scope of his [or her] authority and as such acted without his [or her] discretionary authority.

> "Once the defendant establishes that he was acting within his [or her] discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002). Carey maintains that such has not been asserted by the dismissed named Defendants. In order to decide if the plaintiff is required to meet the shifted burden, it will be necessary for the court to apply a two-part test. First the court must determine "whether plaintiff's allegations, if true, establish a constitutional violation."

*Smith v. Siegelman,* 322 F.3d 1290, 1295 (11th Cir. 2003). In the event the court finds that the allegations do state a constitutional violation, the court must go on to determine "whether the right was clearly established." *Id.* at 1295. Simply put Defendants Riley, King and Shehane were dismissed absent authority and jurisdiction by Magistrate Moorer.

The Magistrate's Recommendation (January 22nd, 2008 Doc#?) chills, or per se forecloses Carey's right to seek Federal relief for the constitutional abridgments suffered by Defendants: "1) Riley, 2) King and 3) Shehane," inclusive to, but not limited too therein, as to the remaining named Defendants: "4) Williams, 5) Weatherly and 6) Longshore," absent the first three named

4

defendants "raising or perhaps first asserting themselves a consent, or an otherwise affirmative defense" does not allow the Courts to *sua sponte* invoke such immunity for them, since Carey's "suit" was in fact against specific named defendants and not against the "State" itself, nor did Carey seek a[ny] monetary relief, but only declaratory and future injunctive relief, thus the Eleventh Amendment proscriptions as applied to this instant case were not applicable to Carey's distinguishable §1983.

Carey respectfully asserts, maintains that *Young* supra, and its progeny provide for prospective injunctive relief for ongoing violations of federal law, worthy of this Court's judicial scrutiny under the United Supreme Court's holding in *Wilkinson v. Dotson*, 544 U.S. 74, 161 L.Ed.2d 253, 125 S.Ct. 1242 (2005). Carey asserts, maintains that at least five other known Plaintiffs have filed, individual §1983 suits against these same specific named Defendants, above, whereas Carey requests that this Court "*take judicial notice*" of the ongoing Federal Constitutional violations both "*pending*" and at present "*rising*," *see 1) Patrick J.Charest, #182262@ 2:07-CV-984-MHT, before Magistrate Walker; 2) Johnny Brown, #110326 @ 2:07-CV-1123-MHT, before Magistrate C. Coody, 3) Ronald Sutton #210657 @ 2:08-CV-0003, before Magistrate Walker; 4) Willie Lee White, #140147 @ 2:07-CV-1080-MHT, before Magistrate T. Moorer, 5) Bernies Burnett, #132146 @ 2:08-CV-22-WKW before Magistrate T. Moorer* with respects to how Alabama state prisoners are *arbitrarily, capriciously and unconstitutionally being* denied "fair" Parole consideration inapposite to both *Wilkinson v. Dotson*, supra, and *Greenholtz v. Nebraska*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979) progeny's –being evaded plenary review by this Circuit's Magistrate Moorer.

In the present case, Carey's Complaint sought a simply declaration that certain acts by specific named Defendants be ruled unconstitutional and unlawful and asked the Court to enjoin

5

such practices and take remedial action to ensure that the Defendants comply with all such laws in the future, primarily because State law does not otherwise provide a[ny] adequate procedural safeguard for such denials. As such, the *Ex Parte Young* exception applies and there was no rational basis for dismissal of Defendants Riley, King nor Shehane. Accordingly, the *sua sponte* Dismissal based on the Eleventh Amendment should be reversed. *See Ex Parte Young*, 209 U.S. at 159-160; *Sandoval v. Hagan*, 197 F.3d. 484, 492 (11th Cir. 1999); *Ocean v. Kearney*, 123 F. Supp.2d 618, 621 (S.D. Fla. 2000).

Carey adamantly objects to this Court summarily dismissing a person, party named as Miriam Shehane (from VOCAL, i.e., *"Victims of Crime Against Leniency,"* as one of the defendants in the civil action, merely because the Magistrate misapprehended Carey's sole claim against Defendant Miriam Shehane (from VOCAL) whereas the Board has exercised coercive power –and in fact provided significant encouragement through both overt, covert practices imputed to discriminatory act(s) by Defendant M. Shehane, her agents, employees, representatives or otherwise commingling with the Board –specifically Defendants Wynn, Weatherly and Longshore, their agents, employees, representatives whom collectively, separately **denied** Carey a *"fair, proper parole consideration, notification,"* tantamount to that of the State's arbitrary – capricious reasons or in this instance outright flagrantly usurpation of State law, or legislative intent promulgated it by state statutes. See *Blum v. Yaretsky*, 457 U.S. 991, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982), *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 941, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982) (state action present if action of private entity is "fairly attributable" to state or where private actor operates as "a willful participant in joint activity with the State or its agents.").

Carey maintains to District Judge Thompson, that he has effectively met this Circuit's holdings in accord with *stare decisis* of both the Eleventh Circuit, and ultimately the United States Supreme Court as well, in that the three (3) prong test as been proven, which is the exception to holding, that an alleged private organization cannot be held actionable under §1983.    First, of the three prong's –known as "1) the public function test, Carey maintains, and hereinafter asserts, that Defendant Miriam Shehane (Vocal) has now for years –as a private organization, commandingly -conspired with the Board to effectuate denials of parole against, not only Carey as alleged by this civil tort -but other Alabama inmates as a whole -thus Defendant M. Shehane has, and is currently engaged in ongoing usurpations of State law –inapposite to Federal strictures of the United States Constitution by politically participating, assisting the Board, the State of Alabama –albeit through Defendant's Governor Riley's and General King's first hand knowledge, and approval to effectuate denials of "*fair, proper consideration*" for parole as-applied to Carey, therefore Defendant Shehane is actively "performing functions *traditionally the exclusive prerogative,*" of the State, through flagrant overt act(s) –inaction(s) with members, agents, employees of the Board, and or inclusive to, but not limited to Defendants Governor Riley et. al., and / or General King et. al., or all of the above prior to Cary's parole, in violation of State law doctrine, as the foregoing –excerpts predicate:

> "**1**) §15-22-23(b)(2)(a)(Board of Pardon & Paroles . . . conditions to board approving [*paroles*] . . . due notice), and Section (3) of §15-22-23 (Persons who are required to be notified under the provisions of this section have been allowed, at their option to either appear before the board and give their views in writing); **2**) §15-22-24(j) empowering the Board with (" 'the power authority to administer oaths, affirmations, examine witnesses and receive evidence on all matters to be considered by the board.'"); **3**) §15-22-25(a) ("As to each prisoner . . . [W]hen all such existing available records have been assembled, they shall be presented to the board or some officer designated by it, who shall determine whether any further investigation of such prisoner is necessary at that time . . . the board shall thereupon order it made . . . the results of it with all other information shall be filed in the office of the board so as to be readily available

7

when the parole of such prisoner is being considered'".); also **4**) §15-22-28(a)
("it shall be the duty of the Board of Pardon & Paroles . . .. to make
investigations of any and all prisoners confined . . . be made from time to time
as the board may determine or as the Board of Corrections or any of its officers,
agents or employees."); **5**) §15-22-28(e) –as promulgated by Legislation–
granting unto the Board the power to "*adopt policies, procedural guidelines for
establishing parole 'eligibility' and 'consideration' dockets based upon its
evaluation of prisoner's prior record, nature and severity of the present offense,
potential for future violence, and community attitude toward the offender.*'" **Id.**
Thus without a doubt, §15-22-28(e) ("The board shall not grant a parole to any
prisoner who has not served at least one third or 10 years of his sentence,
whichever is the lesser, exception by unanimous affirmative vote of the
board."); **6**) §15-22-36(a) –interesting as it may otherwise be, this State statute
promulgates, by legislation the **Authority to grant . . . paroles and . . . notice
of the board action**: '(a) In all cases, except **treason and impeachment and
cases in which sentence pf death is imposed and not commuted, as is
provided by law, the Board of Pardons and Paroles shall have the authority
and power, after conviction and not otherwise, to grant . . . paroles . . .**'").
**Id.**, then at §15-22-26(b) it states: ('Each member of the Board of Pardon and
Paroles **favoring . . . parole shall enter in the file his reasons in detail,** which
entry and the order shall be public records . . .'"). **Id.**, again at §15-22-36(d),
that ('The Board of Pardons and Paroles shall have no power to grant . . . or
order parole . . . until 30 days written that the prisoner is being considered
therefore has been given by the board to the Attorney General . . . in which the
subject was convicted.'"). **Id.**

The task of statutory construction begins, and normally ends, with the plain meaning of a

statutory provision's words and wording. *Am. Gen. Fin., Inc. v. Paschen (In re Paschen),* 296 F.3d

1203, 1207 (11th Cir. 2002); *United States v. Padilla-Reyes,* 247 F.3d 1158, 1163 (11th Cir. 2001).

The first step "is to determine whether the language at issue has a plain meaning with regard to the

particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 136 L. Ed. 2d 808,

117 S. Ct. 843 (1997). "The plainness or ambiguity of statutory language is determined by

reference to the language itself, the specific context in which that language is used, and the broader

context of the statute as a whole." *Id.* at 341.        In short –the Board acted contrary to, with

Defendant M. Shehane prior to Carey's 2006 parole "eligibility and subsequent consideration"

despite both State law, and Federal mandates governing   States by the Fifth, Fourteenth

Amendments, promulgated to protect and limit procedural guidelines utilized to grant / deny Carey parole; which said acts, inactions, omissions can fairly be attributed too, and associated with usurpation of Legislations intent, and outside influences from Defendant M. Shehane, giving rise to the first prong." *See National Broadcasting Co., Inc. v. Communications Workers of America, AFL-CIO*, 860 F.2d 1022, 1026 (11th.Cir.1998). [1]

    <u>Secondly</u>, Carey maintains under the test strictures, that: "2) <u>the state compulsion test</u> has likewise been met, whereas the above cited statutory excerpts –predicate Legislatively the States limitations, as to its agents, employees, and representatives, in that their lawful performances as-applied to Carey; nevertheless as to instances where the State "has coerced or at least significantly encouraged the action as-alleged herein violating the Constitution." Defendant Governor Riley's act(s), inaction(s) and outright omission(s) coupled with General King's usurpation of Carey's Constitutional rights –explicitly protected under the Due Process Clause and Equal Protection Clause have been compromised by said state actors commingled with the Board, albeit through State statutes (cited above), *inter alia*, said Defendants have acted contrary to Federal law –by encouraging both the Board, and Defendant M. Shehane to have performed State functions with their approval, knowledge towards Carey's parole *"eligibility –consideration,"* basically, primarily –inapposite to "a) the type, and class of conviction, b) his ethnicity and c) social stigma as a male inmate, d) the current, ongoing flagrant act(s) omission(s) instituted by the political system currently governing the exacerbated prisons in Alabama –results from the above named Defendants, Carey asks, request, that this Court *"take judicial notice of,"* the foregoing exhibit, from <u>The Huntsville Times</u>, dated October 24, 2007 under the heading Prisons and parole:

---

[1] This circuit has noted that the three primary test apply in cases where as party seeks to hold a private actor liable under the sate action doctrine. <u>**NBC**</u>, 860 F.2d. at 1025 n. 4.

"'Troy King's plan is impractical and flies in the face of data. '[L]ast week he stood on the steps of the state parole board and said a prison sentence is a prison sentence and no way, no how should it be reduced. . . . What King's proposal would do, in practical terms, is undermine efforts now under way for the state to get a handle on prison overcrowding and the prevention of federal interference in Alabama's system of corrections. Alabama is in its current mess because politicians demagogued being "tough on crime." . . . "[L]egislation has fallen woefully short for adequate facilities and corrections officials, if King's lock the door and throw away the key approach were followed, it would take tens of millions more in state dollars to provide additional facilities." . . .     **Political aspirations?** "[ ] . . . throw away a parole system . . . require the state to spend millions keeping prisoners who have shown they are good risks for parole makes no sense in terms of justice or fiscal prudence." [Quote -un-Quote].

See attached _Exhibit-A, inter alia._          Here, Alabama's Constitution, and statutory schemes obligate the State to provide "adequate post-deprivation procedural, safeguard protections" to parole denial(s) as-applied to Carey's facts, circumstances as Alabama does for parole violators": the entanglements woven by Defendant M. Shehane with the Board creates a partnership with the State, such as they become an integral part of the State in administrating the statutory schemes extrapolated above, creating the _exception_ to maintaining the current §1983 action against Defendant M. Shehane albeit under the guise of a private organization against leniency (VOCAL).

The third prong, up for discussion, review as maintained by Carey is "3) the nexus / joint action test which has likewise been met, as well, as complained of by Carey, whereupon Defendants Governor Riley, General King and the Board have "insinuated themselves into positions of interdependence with M. Shehane -that its become a joint participation in the parole consideration activities," in Alabama, as such intertwining themselves into a _"symbiotic relationship,"_ that ultimately satisfies the nexus / joint action test upon this instant action. Thus this Court must now openly, honestly decided whether vel non Carey has met the sufficiency for state action to sustain a §1983 action against Defendant M. Shehane, on case-by-case basis. _See Bailey v. McCann,_ 550 F.2d 1016, 1018 (5th.Cir.1977). "Only by sifting facts and weighing

10

circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance," as requested respectfully by Carey to the flagrant usurpations by the Defendants hereinafter. See *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

WHEREFORE PREMISES SHOWN, Carey prays that this Court would *GRANT* the above styled Objection under the exceptional clause invoked above, as applied to this instant cause of action under the special facts argued above, or other alternative relief this District Judge affords this pro se pleading.

Done so this January 28th, 2008.

Respectfully submitted,

*Anthony Carey*
Anthony Carey #152763

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a true and correct copy of the OBJECTION upon the Honorable D. Hackett –for delivery upon the District Judge M. Thompson for proper judicial review, placing said same in the U.S. mailbox –properly addressed as Post Office Box #711, Montgomery, Alabama 3610-0711.

Done so this January 28th, 2008.

Respectfully submitted,

*Anthony Carey*
Anthony Carey #152763
L.C.F.  H-Dorm
28779 Nick Davis Road
Harvest, Alabama 35749-7009

CAREY, Anthony #152763
L.C.F. H-Dorm
28779 Nick Davis Road
Harvest, Alabama
35749-7009

Purple Heart
USA 41

Legal Mail

United States District
Court: Hon. D. Hackett
Post Office #711
Montgomery, Alabama
36101-0711

2:07-CV-1106-MHT

"This correspondence is forwarded from an Alabama [illegible] The contents have not [illegible] and the Alabama Department of Corrections is not responsible for [illegible] or content of the enclosed communication."

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

**In re:**          **2:07-CV-1106-MHT**

Anthony Carey, #152763

Plaintiff,

Vs.

Alabama Pardon & Paroles et. al.,

Defendants.

---

# E X H I B I T

# A

---

Prepared by Anthony Carey
Pro se #152763
Limestone Correctional Facility
28779 Nick Davis Road
Harvest, Alabama
35749-7009

# Prisons and parole

## Troy King's plan is impractical and flies in the face of data

Troy King wants to raise your taxes. Yes, that's what the conservative state attorney general has to be promoting – a whopper of a state tax increase. That's the only way he can possibly pay for his advocacy to end all prison paroles.

King, of course, doesn't see it this way. Or at least he doesn't say it this way.

No, he stood last week on the steps of the state parole board and said a prison sentence is a prison sentence and no way, no how should it be reduced.

King called it "truth in sentencing," and says it's needed to convince lawbreakers they are going to get what's coming to them. King's use of the phrase confuses what he wants with efforts by proponents like former Attorney General Bill Pryor to make sentences more in line with the seriousness of the crime and to help set standards, as King's all-or-nothing effort tangentially suggests, for time served and possibilities of parole.

What King's proposal would do, in practical terms, is undermine efforts now under way for the state to get a handle on prison overcrowding and the prevention of federal interference in Alabama's system of corrections.

Alabama is in its current mess because politicians demagogued being "tough on crime." We've thrown nonviolent offenders into cells for lengthy terms to the extent that, in 2003, Gov. Bob Riley was forced to set up a second paroles board to speed up the release of the less dangerous inmates so that those who posed a threat to society's safety would remain behind bars.

As it is, the Legislature has fallen woefully short of providing enough money for adequate facilities and corrections officials. If King's lock the door and throw away the key approach were followed, it would take tens of millions more in state dollars to provide additional facilities. That's one fact the politicians don't want to face – and neither do most of Alabama's citizens.

King's tough talk, of course, totally misses the point that prisons aren't just about punishing behavior but correcting it as well. And when you look at the figures, what he's suggesting doesn't play out well for public safety.

Never mind that inmates on parole have, in some way, proved themselves to have learned their lessons and remain under regular supervision once they leave prison. Never mind that the state makes efforts to help them reintegrate themselves into society as productive citizens.

Instead, focus on this: A 1999 study showed that 22 percent of those paroled were back behind bars within three years. But, it also showed that 37 percent of those who weren't released until the end of their sentences were imprisoned again within three years.

Make no mistake: Violent people who would threaten others if allowed to roam free should stay behind bars. No one argues that.

## Political aspirations?

But to throw away a parole system that has proved effective in so many cases and to require the state to spend millions keeping prisoners who have shown they are good risks for parole makes no sense in terms of justice or fiscal prudence.

Lynda Flynt, executive director of the Alabama Sentencing Commission, characterized King's stance this way: "I understand Troy King's position from law and order and tough on crime and running for re-election."

Since King was recently re-elected, this sounds more like preparation for additional political aspirations.

It also sounds imprudent and in disregard of the strong evidence against it.

And if all that is true, it's also shameful.

**By David Prather, for the editorial board. E-mail: david.prather@htimes.com**

# State prison population nears high despite second parole board

**By DESIREE HUNTER**
*The Associated Press*

MONTGOMERY — The number of inmates squeezed into Alabama's overcrowded prisons is back near the state's all-time high of 28,440 just six months after the end of a second parole board that helped release inmates faster and created more prison space.

The state's prisons were built to handle less than half of the 28,338 inmates who were behind bars in March. Corrections officials say the numbers will likely get worse before they get better, with no plans to reinstate the second board and a years-long lag until new sentencing guidelines make a substantial dent.

March is the most recent month for which complete inmate population numbers are available.

"Overall the population is rising again, which is persistent with the projections prior to just before the second parole board was put into place," Alabama Department of Corrections spokesman Brian Corbett said in an interview. "It's something we knew was going to happen."

But officials like the Alabama Sentencing Commission's Rosa Davis say things could be a lot worse and would have been if not for the work done by the second board.

The prison population was lowered to 26,600 during the three years of the second board, which began in 2003. It was dissolved on Sept. 30 after state legislators failed to pass a bill that would have extended it for another three years.

> *"Overall the population is rising again, which is persistent with the projections prior to just before the second parole board was put into place. It's something we knew was going to happen."*
>
> **BRIAN CORBET**

A 2003 sentencing commission report predicted there would be 32,106 to 33,445 inmates in Alabama prisons in September 2007.

"We need to look at what it would have been if no changes had been made at all," Davis said. "That's an important part. If you look at these reports, then you have a differential of possibly 5,000 inmates that DOC is not responsible for today."

Opponents of renewing the second board said it wasn't needed anymore because the number of eligible parole cases had dwindled low enough for one board to handle.

Robert Oakes, a Pardons and Paroles division director, said judges have been issuing more split sentences, where inmates serve a portion of their sentence in prison and the rest on probation. Only sentencing judges can review those cases, Oakes said.

"A large portion of the DOC population are split sentences that nobody can review or release," he said. "At one time at least one-third were inmates on split sentences."

Prisons Commissioner Richard Allen said the second board had an unintended consequence of reducing the department's budget by releasing inmates who would have otherwise been employed in a work-release program. The program went from generating about $19 million annually to around $9 million with the smaller work force, he said.

Allen isn't voicing support for bringing the board back, but says Chief Justice Sue Bell Cobb's reform plans should fill the void and continue where the panel left off.

"She expects (judges) to support sentencing guidelines and that's going to be putting the numbers down," he said. "She wants to establish drug courts in every county and we want community corrections programs in every county. She'll be pushing those programs with us."

The new voluntary guidelines that let judges shorten sentences for certain drug felonies from one to 10 years to a range of one to about five and one-half years went into effect in October and early results are already being seen, said Lynda Flynt, executive director of the sentencing commission.

"I think that you've got to take into consideration that these standards are ongoing and they will have an immediate effect, but we won't know how much until we have solid data," she said. "We do know admissions are down. We're hoping that it's because of these changes."

The corrections department has admitted 5,224 people from October through March, 322 fewer than the 5,546 admitted during Oct. 2005-March 2006.

Commission statistician Bennet Wright said the agency is gathering data on judges' compliance.

## DHR:
## Meetings set for accountability

From Page 1B

percent in May 2006 to a low of 6 percent in August. By March this year, it was back up to 19 percent because of staff short-pared to the rest of the state. Once again, Jefferson County's numbers were better than the rest of Alabama, but in both cases, managers acknowledged they would like the numbers to improve. More manpower and routine checks to see how workers are managing their case loads could make that happen, they said.

During the course of

County DHR director, said the challenge is to not get lost in percentages, but to remember what they mean.

"One thing you want is a sense of urgency and making sure we have the right expectations," she said. "These numbers mean children."

Part of the reason for the monthly meetings, Walley said

---

## PELHAM
## One person dies in car wreck

An early morning car dent in Pelham Sunday one person dead, accor a Pelham firefighter. Ba Chief Blair Sides said or son died about 1:30 a.m Shelby County 11 and V Timber Parkway. More were not available.

*Jeren*

## IRONDALE
## SUV overturns, killing one person

An accident on Interst 459 Sunday evening kille person and left another talized, according to stat troopers. An SUV overtu just before 6 p.m. near th Derby Parkway exit, acco to Irondale police. One p was transported to UAB pital, troopers said. The i ties of those involved we available.

*Hannah W*

## CRIME REPORT

These crimes were rep to Birmingham police:

▶ Devonta Mitchell, 34 police his left index finge shot when he tried to bre a fight between two men urday at 7:30 a.m. Mitche said he did not know whe the incident occurred.

▶ Clover Howze, 34, o mingham was treated at Hospital after a bullet gra his chest at 12:45 a.m. Sa day. Howze told police he breaking up a fight betwee group of males outside a apartment in the 3200 bl Avenue S Ensley when or the males began firing a g Howze said he ran and la realized he was shot.

*Jeremy*

## Terminal helpe win steel plant

MOBILE — One of the to bringing Thyssen AG's steel facility to nort bile County was solvi rather large logistical pro how to get crude steel shipped in from Brazil plant on the Tombigbee I

While rival Louisiana able to accommodat

# Inmate population creeping up again

▶Continued from Page 1B

September was 29,235 — about twice the designed capacity of state facilities. The September 2006 number was 27,954.

Allen said in an Aug. 29 statement that the department planned to bring all male and female prisoners back to Alabama by the end of the year.

All female prisoners have been returned. He said the unexpected delay in opening a private therapeutic education center in Columbiana, Ala., has kept the state from bringing the rest of the prisoners back.

Corbett said recently that 276 male inmates remained in Louisiana. He said the number could fluctuate based on the number of prisoners in county jails and the available space in Alabama facilities. At one point, the state had about 1,000 males and 400 females incarcerated outside of Alabama.

Corbett said the number of state inmates in county facilities beyond the court-ordered 30-day limit "is up slightly, but nothing like they used to be." Counties once housed several hundred state inmates.

The number of state prisoners in county jails climbed to 142 last week, Allen said, but was down to 101 on Monday. "We will be bringing it back down to zero in the next couple of weeks," he said.

The number of state-sentenced prisoners in county jails is the source of a decades-old lawsuit. The state has 30 days to pick up sentenced inmates, according to a 1994 court decree.

County officials argue that state prisoners take up space and increase costs. Corrections officials say they do not have anywhere to put the prisoners.

With the recent increase of inmates in county jails, Corbett said, there is concern about the ongoing litigation, but "I wouldn't say there is alarm."

The Corrections Department had kept essentially all state inmates out of county facilities beyond the 30-day limit since about August 2006, about three months after a judge's order held Allen in contempt of court and threatened to jail him.

Corbett said he knows there has been ongoing communication with the Alabama Sheriff's Association about the situation.

John Hamm, program coordinator for the association, said no counties have complained recently about too many state inmates in their facilities. The association and its attorneys monitor the situation every week, he said.

"It is a number that is gradually increasing," Hamm said. "It is only a matter of time before we'll be in the same situation it has been in the past."

Hamm said that each time the issue becomes a problem for counties, the sheriffs go to the judge, who makes a ruling, and the numbers go down, he said.

"It will stay down for a period of time and then start coming back up," Hamm said. "It is sort of a cycle, but it is always a problem."

---

# Inmate population creeping up again

By SEBASTIAN KITCHEN
Capital Bureau

MONTGOMERY — Alabama's prison population continues to climb, and in the last two weeks, the number of state prisoners sitting in county jails longer than a court-ordered 30-day limit has started creeping up, Corrections Department officials said.

Department spokesman Brian Corbett said the overall prison population has increased as the state brings back hundreds of prisoners who had been doing their time in Louisiana.

Corrections Commissioner Richard Allen noted that officials also recently shut down intake for a couple of days to work on a computer program for classification, putting state prisoners in county jails awaiting transfer into a state facility on further hold.

Kate Johnson, spokeswoman for the Mobile County Sheriff's Office,

said the Metro Jail currently has 161 state inmates, and 43 of those have been there for fewer than 30 days.

Of the remaining 118, the average length of stay is 106 days, she said. The state inmates are housed separately.

"If this continues to increase, it certainly will become a problem," Johnson said. "We're dealing with it. As it stands, our jail is overpopulated."

Major Anthony Lowery of the Baldwin County Sheriff's Office said, "We're actually in good shape. There are doing very well by us, getting them out."

The Corrections Department anticipates a more than $30 million budget shortfall.

The state has a contract with Louisiana facilities to house inmates to reduce overcrowding here. The Alabama prison population in

Please see Inmate Page 3B ▶